Filed
1/7/2022 9:22 PM
**Beverley McGrew Walker**
District Clerk
Fort Bend County, Texas
Norma Sosa

CAUSE NO. 18-DCV-256883

| | | |
|---|---|---|
| Kelli Most, Individually and as | § | IN THE DISTRICT COURT |
| Personal Representative of the Estate | § | |
| Of Jesse Henson, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | FORT BEND COUNTY, TEXAS |
| | § | |
| Team Industrial Services, Inc., | § | |
| | § | |
| *Defendant.* | § | 268TH JUDICIAL DISTRICT |

## ORDER

On January 4, 2022, the Court heard Plaintiff's Motions for Sanctions. After considering the motion, all responsive and all related briefing, the attachments to the motion, response, and related briefing, the Court's file, the matters considered by the Special Master, any documents tendered *in camera*, the Court's own observations during trial and at hearings in this case, the arguments of counsel, and the applicable law,[1] the Court GRANTS the motion for sanctions for the reasons set forth below.

### I.    Background giving rise to this sanction award.

This wrongful-death and survival action was hotly contested. The parties are represented by able counsel.

This case was tried to a jury in May 2021 over a several-week period, during the height of the pandemic, which required the Court to take extra precautions to ensure the safety of the jurors, the litigants, and the Court's staff. Considering the circumstances in which this case

---

[1] At the hearing on the motion for sanctions, as it was permitted to do, the Court took judicial notice of the Court's file and the record in this case. *See Marble Slab Creamery, Inc. v. Wesic, Inc.*, 823 S.W.2d 436, 439 (Tex.App.—Houston [14th Dist.] 1992, no writ).

ROUTED TO COURT    1/10/2022   NS
RT'D TO D. CLERK    1/13/22 AS

was tried, it was incumbent on the parties and counsel to maintain the integrity of the process and not to engage in unprofessional tactics, tactics intended to delay, or tactics that could put the Court, its staff, the jurors, the trial, and the participants at risk.

Unfortunately, Defendant and its counsel failed in this regard. Collectively, they engaged in gamesmanship that was intended to and did result in unnecessary delay. They made material misrepresentations to the Court, upon which the Court and opposing counsel relied, and which representations proved to be demonstrably false. They acted in concert to delay trial, to encourage a critical witness to change his testimony, and to proffer testimony to the Court and to the jury that both the witness and defense counsel knew to be false. They violated Court orders as well.

While the Court is generally reluctant to issue sanctions, the Court's reluctance gives way in this case in light of the egregious conduct the Court observed during and after trial – conduct that both Defendant and some (but not all) of its attorneys[2] engaged in for an impermissible reason and with an improper motive.

## II.    Procedural timeline.

This case was filed on November 13, 2018. The trial commenced with jury selection beginning on May 4, 2021. Plaintiff then filed a motion for sanctions on May 18, 2021. The motion alleged, in large part, that: (1) Defendant knowingly misrepresented to the Court and to opposing counsel when a key witness, Gary Gautney, would be available to testify at trial; (2) Defendant influenced Gautney to testify untruthfully in material respects at trial; and (3) Defendant violated multiple court orders at trial. The motion also sought discovery into the

---

[2]    Specifically, the offending attorney conduct described in this order is attributed only to Mr. Schreck and Ms. O'Neill.

circumstances surrounding Mr. Gautney's testimony.  Defendant filed a response brief on May 25, 2021.

The trial concluded on May 27, 2021.  The jury deliberated a little less than 1.5 days. A verdict was reached on June 1, 2021, following the Memorial Day holiday.  After the verdict, the Parties engaged in discovery and motion practice regarding the sanctions motion.  The Court then conducted an oral hearing on the sanctions motion on January 4, 2022.

### III.    The legal standards the Court considered in assessing sanctions.

This Court has inherent power to impose sanctions to aid the exercise of its jurisdiction, facilitate the administration of justice, and preserve the independence and integrity of the judicial system.  *Brewer III v. Lennox Hearth Products, LLC*, 601 S.W.3d 704, 718 (Tex. 2020); *In re Bennett*, 960 S.W.2d 35, 40 (Tex. 1997).  The Court's inherent power enables it to perform its judicial functions.  *Eichelberger v. Eichelberger*, 582 S.W.2d 395, 399 (Tex. 1979).  The Court may exercise its inherent power to deter, alleviate, and counteract any significant interference with its core functions, such as hearing evidence, rendering and enforcing final judgments, managing its docket, and issuing and enforcing its orders.  *Davis v. Rupe*, 307 S.W.3d 528, 531 (Tex.App.—Dallas 2010, no pet.); *Liles v. Contreras*, 547 S.W.3d 280, 290-91 (Tex.App.—San Antonio 2018, pet. denied).  "Making misleading statements and misrepresentations to the court interferes with these core functions."  *Davis*, 307 S.W.3d at 531.  As part of its inherent power, the Court may impose sanctions for conduct that, if tolerated, "breeds disrespect for and threatens the integrity of our judicial system."  *In re Bennett*, 960 S.W.2d at 40.

The Court's inherent power to sanction applies to "recalcitrant litigants," *Altesse Healthcare Sols., Inc. v. Wilson*, 540 S.W.3d 570, 572 (Tex. 2018), and "errant counsel" who

engage in "improper trial conduct." *Remington Arms Co. v. Caldwell*, 850 S.W.3d 167, 172 (Tex. 1993). In considering whether a sanction against a party is just, the Court takes into account that, "in the context of an enduring attorney-client relationship, knowledge acquired by the attorney is imputed to the client." *American Flood Research, Inc. v. Jones*, 192 S.W.3d 581, 584 (Tex. 2006). Moreover, while sanctions may be visited exclusively on the attorney if the evidence demonstrates that the offensive conduct is attributable to counsel alone, sanctionable conduct may be attributed to a party when the party is or should be aware of counsel's conduct and the violation of applicable rules. *See TransAmerican Nat. Gas Corp. v. Powell*, 811 S.W.2d 913, 917 (Tex. 1991).

Because of the potency of its inherent powers, this Court exercises them with restraint, discretion, and great caution, aware that any sanction it issues must be just and not excessive. *See Brewer*, 601 S.W.3d at 718; *TransAmerican*, 811 S.W.2d at 917. When considering which sanction, if any, is "just," the Court focuses on the relationship between the offensive conduct and the sanction imposed and directs the sanction against the abuse and toward remedying the prejudice caused the innocent party. *Id.* Thus, the Court must determine whether sanctions should be imposed on the party, its counsel, or both. *Id.*

To protect the integrity of the judiciary and the judicial process, the Court may rely on its inherent authority to "impose a wide array of sanctions—from slap-on-the-wrist ethics-education orders to death-penalty dismissal orders—in response to an equally wide array of sanctionable conduct." *Brewer*, 601 S.W.3d at 740 (Boyd, J., concurring). Death-penalty sanctions are generally reserved for the most egregious cases, in which the offending party's conduct justifies a presumption that its claims lack merit. *Altesse*, 540 S.W.3d at 572. Such sanctions may be justified in cases of flagrant bad faith. *Id.* at 575. Even in cases of bad faith,

the Court is mindful that it should avoid a "trial by sanctions" if possible.  *Id.*

In deciding which sanction to choose, the Court has been deliberate to ensure that the punishment imposed fits the crime.  *See Altesse*, 540 S.W.3d at 572; *TransAmerican*, 811 S.W.2d at 917.  The Court has also considered the *Low* factors.[3]  With these principles in mind, and in spite of the flagrantly bad-faith conduct that the Court has observed in this case, the Court declines to assess death-penalty sanctions.  Instead, the Court fashions an appropriate, lesser sanction, which is levelled at those who engaged in the conduct set forth in the findings below.

---

[3]       *Low v. Henry*, 221 S.W.3d 609, 620 n. 5 (Tex. 2007).

## IV.     Findings of fact.

<u>The concerted effort to mislead and delay for strategic advantage.</u>

1.  Plaintiff wished to call Gary Gautney as the first witness at trial, immediately following opening statements, which would have occurred on Friday, May 7, 2021.

2.  Mr. Gautney was a key witness in this case.  He resides in Oklahoma.  He was a former employee of Team and was represented by an attorney (Donna Thomisee), a lawyer chosen by and paid for by Team's insurance carrier.

3.  On May 6, 2021, however, counsel for Team, Ms. O'Neill, asked the Court to delay the start of evidence until May 10, 2021.   As the alleged basis for requesting a delayed start, Ms. O'Neill represented to the Court and counsel: "We just learned yesterday we can't have [Gautney] here live until Monday [May 10th.]."

4.  Mr. Schreck, also counsel for Team, similarly represented to the Court and Plaintiff's counsel that Gautney was flying to Texas on Sunday (*i.e.*, May 9, 2021).

5.  Team's lawyers' representations that Mr. Gautney was not available to testify until May 10th were false, and counsel for Team knew their representations were false when they made them.

6.  Ms. Thomisee had previously provided Mr. Gautney's travel itinerary to Team's lawyers, and that itinerary reflected that Mr. Gautney would arrive in Texas on May 5, 2021, the day before Team's lawyers represented to the Court that Mr. Gautney would not be in Texas and would not be available to testify until May 10, 2021.

7.  Team's lawyers' representations were made with the intent to delay Mr. Gautney's testifying live so that they and Team would have more time to coordinate with Ms. Thomisee while she spent days preparing Mr. Gautney for his testimony.  Team's lawyers' misrepresentations were also made with the hope of increasing the length of the trial.

8.  The Court believed Team's lawyers' representations to be true and delayed the start of evidence based on them.  As a result, the Court delayed the start of evidence until May 10, 2021.

9.  In the meantime, after misrepresenting Mr. Gautney's availability to testify, Team and its lawyers coordinated with Ms. Thomisee in her preparation of Mr. Gautney.  Team's lawyers communicated with Ms. Thomisee about Team's strategy.  They shared trial outlines and highlighted subjects she should cover with Mr. Gautney; they shared a PowerPoint about how to prepare him for his trial testimony; and they sign-posted the testimony they believed Mr. Gautney should provide to benefit Team's case.

10. Team's in-house legal counsel was present in the courtroom throughout trial. Team also had a representative in the courtroom during the trial.[4] A representative for Team's carriers were also present in the courtroom for nearly all of the trial. Team, its carriers' representatives, and Team's counsel spoke frequently during trial and coordinated their efforts.

11. The only reasonable inference to draw from Team's, its carriers', and their lawyers' coordination, is that all were aware that Team's lawyers' representations made to the Court about Mr. Gautney's availability were false and that they were made with the intent to delay trial so they could spend several days preparing Mr. Gautney for his trial testimony with the intent that he would testify in a way that benefitted Team and was contrary to his prior sworn deposition testimony.

12. Team, its carriers, and their lawyers acted in concert to delay the trial, to prevent Mr. Gautney from taking the stand on the first day of trial, and to elicit testimony from Mr. Gautney that was inconsistent with his deposition testimony and that was false.

13. Mr. Gautney acknowledged during his testimony that he had been in town since May 5, meeting with his lawyer each day, even though Team's lawyers had represented to the Court that he was not available to testify.

14. After being prepared by his lawyer for several days—with the assistance of Team's lawyers—when Mr. Gautney did eventually testify, he lied and/or

---

[4] This representative also attended depositions in the case and was involved in the deposition preparation of Mr. Gautney and Brad Whinery (another key witness).

perjured himself on multiple occasions over the course of his three-day
testimony.

15. Mr. Gautney repeatedly testified contrary to his deposition testimony, recanted
his deposition testimony, and refused to stand by his deposition testimony even
though he acknowledged under oath he had read and signed his deposition
without making any changes to it.

16. The impact of Mr. Gautney's taking the stand after this concerted effort to shape
his testimony was substantial and impacted the trial in multiple ways.  Because
of Mr. Gautney's lies and/or perjury, Plaintiff's counsel was required to keep
Mr. Gautney on the stand for several days to point out the lies and discrepancies
between his deposition testimony and his trial testimony.  Otherwise, there
would have been no reason for Mr. Gautney's testimony to last for more than a
single trial day.

17. Additionally, Plaintiff's counsel was required to cover with other witnesses the
subjects on which Mr. Gautney had changed his testimony, recanted it, or
refused to stand by it.

18.  The trial was delayed significantly and lasted longer than it would have but for
the concerted efforts of Team, its carrier, and their lawyers to delay the start of
Mr. Gautney's testifying to coordinate with him in providing false testimony.

19. As a result of this delay, one juror was lost during closing arguments.  While an
alternate juror was available to take the excused juror's place, no more alternate
jurors were available in case another juror was lost. When the Court expressed
its concern about potentially losing another juror, Team's lawyer represented to

the Court that going forward with 11 jurors would be acceptable to Team.  But, after the juror was lost because of the Team-caused delay and gamesmanship, and after another juror was dismissed, Team's counsel objected to continuing with 11 jurors and sought a mistrial.

20. By affirmatively consenting to an 11-member jury, Team expressly waived any right to object to the jury's verdict on the ground that it was rendered by 11.

21. The fact that the verdict was issued by a jury comprised of 11 rather than 12 did not prejudice Team.  And, in any event, and regardless of any waiver, any alleged prejudice Team may have suffered from an 11-person jury is entirely attributable to the misconduct of Team and its counsel, which caused the trial to last days longer than it would have but for Team and its counsel's misconduct. But for the Team-caused delay, the juror dismissed during closing arguments would have been available to participate in jury deliberations and jury deliberations would have concluded before the date he was eventually excused.

22. Through their flagrantly bad-faith conduct in intentionally causing an unnecessary delay of the start of testimony, coupled with the delay caused by Gautney's false testimony, and their representation to the Court that proceeding with 11 jurors would be acceptable to Team, Team and its lawyers waived Team's right to object to proceeding to verdict with fewer than 12 jurors.[5]

---

[5]    Alternatively, if the above-described conduct does not constitute a waiver, then it provides a basis for striking any objection to proceeding to verdict with fewer than 12 jurors as a sanction, as discussed below in the "sanctions" portion of this order.

23. The misconduct, which was intended to and did cause substantial delay, significantly interfered with the trial court's legitimate exercise of its core function.

24. When asked to account for the misrepresentations, neither of Team's lawyers who made them provided an affidavit, declaration, or testimony attempting to defend their conduct or to explain that it was not untrue. Instead, Mr. Schreck signed an unsworn pleading that was filed with the Court, which attempted to explain away Ms. O'Neill's statement about Mr. Gautney's not being available to testify.

25. In the pleading, Team claimed that Mr. Gautney's father (who suffers from dementia) went missing in Oklahoma on May 7, 2021. To support this claim, Team provided a news story from the internet regarding Mr. Gautney's father's disappearance. But other news stories, as well as information from the Tulsa Police Department, revealed that Mr. Gautney's father was found to be safe just a few hours after he was reported missing. Team's lawyers then used this news story to attempt to recast Ms. O'Neill's statement as one directed to Mr. Gautney's emotional "readiness to testify live," not a representation about "his physical presence inside or outside Texas."

26. This after-the-fact explanation is not credible for several reasons. First, Ms. O'Neill represented to the Court on May 6, 2021, that "We just learned yesterday [May 5th] we can't have [Gautney] here live until Monday [May 10th.]" Mr. Gautney's father, however, did not go missing until May 7, 2021, the day after that misrepresentation and two days after counsel claimed to have

learned that Gautney was unavailable.

27. Second, Ms. O'Neill's representation that Mr. Gautney cannot be "here live" until Monday referred to his physical presence.  Given the context of the statement, no reasonable person would interpret it otherwise.

28. Third, Mr. Schreck represented that Mr. Gautney was flying to Texas on May 9, 2021.  That is a direct representation "about Gautney's physical presence inside or outside Texas."

29. While the Court is sympathetic to Mr. Gautney's family situation, the Court is offended by Team's and its lawyers' attempts to use this tragic situation as an after-the-fact attempt to justify the intentional misrepresentations made to the Court for the purposes of delay and to gain a strategic advantage at trial.

<u>Mr. Gautney's testimony.</u>

30. After being coached for several days, Mr. Gautney repeatedly lied and/or perjured himself during his three days of trial testimony.

31. By way of context, Plaintiff blamed Mr. Gautney for failing to properly inspect and repair a valve that ultimately malfunctioned and led to the death of Jesse Henson.  At the time of the incident, Mr. Gautney was employed by Team, but he ceased working for Team after the incident.

32. Mr. Gautney was deposed in this case.  Prior to his deposition, he engaged in lengthy preparation with Team's lawyers over the course of multiple days.  He disclaimed any attorney-client relationship with Team's attorneys at his deposition, and Plaintiff's counsel cross-examined him extensively during the deposition about his meetings with Team's attorneys.  Mr. Gautney provided

testimony at his deposition that was damaging to Team's defenses at trial.

33. The only reasonable inferences that can be drawn from what ensued follow: Team and its lawyers devised a plan to get Mr. Gautney to provide more favorable testimony at trial than he had during his deposition, while avoiding similar cross-examination about extensive attorney preparation.

34. Team's insurance carrier hired a private lawyer, Ms. Thomisee, to represent Mr. Gautney.  Ms. Thomisee acted as an intermediary between Mr. Gautney and Team's lawyers.  Team's lawyers prepared Mr. Gautney for his trial testimony, through Ms. Thomisee, while simultaneously keeping the substance of the preparation confidential through invocation of the attorney-client privilege.

35. Ms. Thomisee's existence and role in the case was hidden.  Team's lawyers went so far as planning to schedule a short meeting with Mr. Gautney, ostensibly for trial preparation purposes.  But the planned meeting was actually—to use Mr. Schreck's term—a "diversion," to create the false "impression that our meeting was the extent of his prep."  In other words, Mr. Schreck hoped the "diversion" meeting would come out during cross-examination; Mr. Gautney would testify that he had one short meeting with Team's attorneys; and Plaintiff's counsel (not knowing of Ms. Thomisee's involvement) would move on so the jury would not know the full extent of Mr. Gautney's multi-day trial "prep."

36. Instead of one short "prep" meeting, Ms. Thomisee, Mr. Schreck, and Ms. O'Neill had regular and frequent communications during which Mr. Schreck provided "anchors" and "talking points" to Ms. Thomisee to relay to Mr.

Gautney.  Those "talking points" were often directly contrary to Mr. Gautney's deposition testimony.  Mr. Gautney repeated variations of those "talking points" during the course of his trial testimony.

37. For instance, on May 6, 2021, Mr. Schreck sent a text message to Ms. Thomisee about meeting on Saturday, May 8, 2021.[6]  The text message discussed an issue that Mr. Schreck believed would come up at trial and suggested that the issue could be "handled by helping [Mr. Gautney] see" the facts in a light that could be less damaging to Team.

38. On May 7, 2021, the day that Mr. Gautney would have taken the stand but for Team's lawyers' misrepresentations, Mr. Schreck sent a text message to Ms. Thomisee about "points and anchors for [Mr. Gautney]," followed by a lengthy list of talking points.  Mr. Schreck then e-mailed Ms. Thomisee, and other members of Team's legal team, on May 8, 2021, that he would "like to have [Mr. Gautney] testify in hindsight" to several talking points provided by Mr. Schreck.

39. Ms. O'Neill provided documents entitled "Gautney draft examination" and "Team Argument Outline" to Ms. Thomisee so that Ms. Thomisee would have a roadmap for Mr. Gautney to follow in his testimony.

---

[6]     The Court notes that this text message was sent shortly after Mr. Schreck's and Ms. O'Neill's misrepresentations regarding Mr. Gautney's availability to testify live, and that the meeting was to occur during the period of extra time gained by the misrepresentations that were intended to and did result in the delay of Mr. Gautney's testifying.

40. A later updated version of the "Gautney draft examination" was given to Ms. Thomisee to coach Mr. Gautney about how to handle certain topics that were expected to arise during his cross-examination.

41. During a break in testimony, before Gautney's trial testimony was concluded, Mr. Schreck sent another text message to Ms. Thomisee telling her to instruct Mr. Gautney to "go back to his anchors" when testimony resumed. He also text messaged Ms. Thomisee about "points and anchors for [Mr. Gautney]."

42. The talking points provided to Mr. Gautney, via Ms. Thomisee, were not true and were contrary to portions of Mr. Gautney's sworn deposition testimony.

43. Following the concerted effort by Team, its lawyers, and its carrier's lawyer, to influence improperly Mr. Gautney's testimony, Mr. Gautney provided false and perjurious testimony to the Court and to the jury that was intended to mislead and conceal the truth.

## V.    Sanctions.

The offending conduct described above was committed flagrantly, in bad faith, for an impermissible reason, and with an improper motive. It interfered with this Court's legitimate exercise of its core functions of managing its docket, of conducting a safe and fair trial during a pandemic, and of hearing evidence. It breeds disrespect for and threatens the integrity of the jury-trial process and the judicial system.

The misleading statements and misrepresentations to the Court, the concerted effort to improperly influence the testimony of a critical witness, and the attempted cover-up of the ill conduct support a presumption that Team's defense lacked merit.

Thus, the conduct described could (and very well may) warrant death-penalty sanctions.

*See In re RH White Oak, LLC*, 2016 WL 3213411, at *7-9 (Tex.App.—Houston [14th Dist.] June 9, 2016, no pet.); *See also Daniel v. Kelley Oil Corp.*, 981 S.W.2d 230, 235 (Tex.App—Houston [1st Dist.] 1998, pet. denied).  However, in spite of the bad-faith conduct that Team and its attorneys engaged in, and after careful deliberation, the Court declines to assess death-penalty sanctions.  The Court instead chooses lesser sanctions that allow final adjudication on the merits, that are designed to promote future compliance by Team and its attorneys, and which are intended to deter them and others from engaging in similar conduct.

The Court declines to sanction only Team's lawyers because the offensive conduct is not counsel's alone.  Likewise, the Court declines to sanction only Team because the offensive conduct is not Team's alone.  Rather, the offensive conduct is attributable to both Team and its lawyers, who acted in concert during its commission.

Application of the following *Low* factors[7] supports the sanction award:  (1) Both Team and its lawyers acted willfully and in bad faith; (2) Team was represented by experienced, capable lawyers; (3) Team and its lawyers had already been sanctioned in this proceeding by the Special Master, and then violated that sanction order during trial; (4) Plaintiff suffered prejudice as a result of the offensive conduct, namely, in unnecessary delay that hindered Plaintiff's lawyers' ability to try the case quickly and efficiently under the circumstances, and resulting in the loss of a juror during closing argument, just before the jury began deliberating; (5) having observed Team, its lawyers [and its carrier], and their conduct during and after trial, Team and its lawyers are equally culpable for the offending conduct; (6) permitting such conduct by a party during litigation would chill the other party's ability to receive a fair trial;

---

[7]     221 S.W.3d at 620 n. 5.

(7) the sanctions are directed at the bad conduct and its effect on the Court's ability to carry out its core functions; (8) the impact of the sanction on the Plaintiff and Plaintiff's ability to receive the benefit of a jury verdict that Team and its lawyers attempted to impede; (9) the sanction is no more excessive than necessary to achieve the goal of the sanction, to promote future compliance, to deter future bad conduct, and to ensure the integrity of the jury-trial process and the judicial system; (10) the burden on the Court and the judicial system, including consumption of judicial time and juror time and the safe and efficient administration of justice during a pandemic; and (11) that neither Plaintiff's conduct nor Plaintiff's counsel's conduct caused the prejudice suffered.

After careful deliberation, the sanctions award is as follows:

(1)     ~~Team's defenses related to comparative fault and apportionment of fault to Westar are stricken;~~

(2)     Although Team already waived its objection to proceeding to verdict with 11 jurors, any attempt at an objection by Team is stricken; ~~and~~

(3)     ~~Team and its attorneys are ordered, jointly and severally, to pay to Plaintiff, as a monetary sanction, $1,000,000.~~

These targeted sanctions are levelled at the offenders. They fit the crime, *i.e.*, they punish the offenders for the flagrantly bad-faith conduct in which they engaged. Additionally, no less severe sanctions would be sufficient because lesser sanctions would not eliminate the prejudice that would otherwise result to Plaintiff. Finally, but importantly, lesser sanctions would reward Team and its attorneys for their willful and bad-faith conduct.

Signed this the ___12___ day of January, 2022.

_____

Presiding Judge

## Automated Certificate of eService

This automated certificate of service was created by the efiling system.
The filer served this document via email generated by the efiling system
on the date and to the persons listed below. The rules governing
certificates of service have not changed. Filers must still provide a
certificate of service that complies with all applicable rules.

Leticia Saavedra on behalf of Jason Itkin
Bar No. 24032461
lsaavedra@arnolditkin.com
Envelope ID: 60631379
Status as of 1/10/2022 9:55 AM CST

Associated Case Party: Kelli Most

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Jason Itkin | | jaiteam@arnolditkin.com | 1/7/2022 9:22:45 PM | SENT |
| Jason Itkin | | e-service@arnolditkin.com | 1/7/2022 9:22:45 PM | SENT |
| Cory DItkin | | coryteam@arnolditkin.com | 1/7/2022 9:22:45 PM | SENT |

Associated Case Party: Teem Industrial Services, Inc.

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Andrew Schreck | | aschreck@downsstanford.com | 1/7/2022 9:22:45 PM | SENT |

Associated Case Party: RichardL.Tate

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Patty Fitzgerald | | pfitzgerald@tate-law.com | 1/7/2022 9:22:45 PM | SENT |
| Richard L. Tate | | rltate@tate-law.com | 1/7/2022 9:22:45 PM | SENT |

Associated Case Party: Donna Thomisee

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Greg K.Winslett | | gwinslett@qslwm.com | 1/7/2022 9:22:45 PM | SENT |
| J. CollinSpring | | jspring@qslwm.com | 1/7/2022 9:22:45 PM | SENT |
| Richard LSmith | | rsmith@qslwm.com | 1/7/2022 9:22:45 PM | SENT |

Case Contacts

| Name |
|---|

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Leticia Saavedra on behalf of Jason Itkin
Bar No. 24032461
lsaavedra@arnolditkin.com
Envelope ID: 60631379
Status as of 1/10/2022 9:55 AM CST

Case Contacts

| |
|---|
| Adam Voyles |
| Jonathan B.Shoebotham |
| GeorgeAnn Carmichael |
| Paralegal Ramsey Law |
| Jason Aron Itkin |
| Kelley Maria Keller |
| Jason Itkin |
| Jason Itkin |
| Emily Gamino |
| Daniel D.Horowitz III |
| Melva Trevino-Ware |
| Steven Garcia |
| Scott West |
| Stephen FBaker |
| Nathan Karlin |
| Corey Itkin |
| Selina Broussard |
| LaTasha Porter |
| Jeff Muskopf |
| Mike Rader |
| Michelle Marvel |
| Jim Frickleton |
| Nicole Patterson |
| Paul Smith |
| Mia Tenorino |

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Leticia Saavedra on behalf of Jason Itkin
Bar No. 24032461
lsaavedra@arnolditkin.com
Envelope ID: 60631379
Status as of 1/10/2022 9:55 AM CST

Case Contacts

| Name | | Email | Date/Time | Status |
|---|---|---|---|---|
| Katheryn Oswick | | koswick@foxrothschild.com | 1/7/2022 9:22:45 PM | ERROR |
| Douglas H.Fleming | | dfleming@foxrothschild.com | 1/7/2022 9:22:45 PM | SENT |
| Patrick D.McVey | | pmcvey@foxrothschild.com | 1/7/2022 9:22:45 PM | SENT |
| James E.Breitenbucher | | jbreitenbucher@foxrothschild.com | 1/7/2022 9:22:45 PM | SENT |
| Laura Brackin | | Laura@westfirm.com | 1/7/2022 9:22:45 PM | SENT |
| Brian J.Cathey | | cathey@wrightclosebarger.com | 1/7/2022 9:22:45 PM | SENT |
| Gail Tisius | | GTisius@salawus.com | 1/7/2022 9:22:45 PM | SENT |
| Bridget Pelanne | | bridgetpelanne@warejackson.com | 1/7/2022 9:22:45 PM | SENT |
| Marisa Mata | | mmata@arnolditkin.com | 1/7/2022 9:22:45 PM | SENT |
| Andrew R. Gould | | agould@arnolditkin.com | 1/7/2022 9:22:45 PM | SENT |
| Wallace Jefferson | | wjefferson@adjtlaw.com | 1/7/2022 9:22:45 PM | SENT |
| Robert Dubose | | rdubose@adjtlaw.com | 1/7/2022 9:22:45 PM | SENT |
| Shane Swatzell | | shane@encorelegalprocess.com | 1/7/2022 9:22:45 PM | SENT |
| Adaly Rendon | | adaly@lubelvoyles.com | 1/7/2022 9:22:45 PM | SENT |
| John Ramsey | | John@Ramseylawpc.com | 1/7/2022 9:22:45 PM | SENT |
| Eileen F. O'Neill | | eileenoneill@warejackson.com | 1/7/2022 9:22:45 PM | SENT |
| SSW TEAM | | SSWTEAM@WESTFIRM.COM | 1/7/2022 9:22:45 PM | SENT |
| R. RussellHollenbeck | | hollenbeck@wrightclosebarger.com | 1/7/2022 9:22:45 PM | SENT |