**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| **KELLI MOST, INDIVIDUALLY AND AS ADMINISTRATOR OF THE ESTATE OF JESSE HENSON,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**TEAM INDUSTRIAL SERVICES, INC.,**<br><br>**Defendant.** | **Case No. 2:25-cv-02109-JMK-RES** |

**MEMORANDUM AND ORDER**

This is a wrongful death and survival action in which Plaintiff Kelli Most, individually and as administrator of the estate of her late husband, Jesse Henson, asserts that Defendant Team Industrial Services, Inc., was negligent in failing to properly train, retain, and supervise its employees, and in failing to properly perform its inspection, repair, and maintenance duties of safety relief valves at a Westar Energy coal power plant in St. Marys, Kansas. Team moves for partial summary judgment against Most solely on her claim for punitive damages. Doc. 49. Team also moves to exclude the expert testimony and opinions of Eric L. Van Iderstine, William Carden, Geremy Sanders, Jesse Booth Hall, and Sid Cammeresi. Docs. 45, 53, 55. Most moves to exclude the expert testimony of Leo Haynos, John Gorrell, Tim Stringer, and Jeff McClanahan. Doc. 57.

## I. BACKGROUND[1]

Defendant Team was hired by Westar to perform service and repair work on pressure safety release valves at a Westar power plant (the "JEC") in April 2018. Doc. 44 at 4, 12, 15. Team

[1] The facts are those uncontroverted by the parties unless otherwise indicated. The parties' competing statements of fact on the now-pending motion for partial summary judgment provide little background regarding

possessed a Valve Repair ("VR") certificate of authorization and was authorized to perform VR inspections. Doc. 72 at 6, ¶ 1. Team's work was governed by the National Board Inspection Code, Team's VR Quality Control Manual, and the manufacturer's specifications. *Id.* at 6, ¶ 2. Team knew that the safety relief valve ("SRV") was an extremely important safety device and knew that people's lives depended on the SRV working correctly. *Id.* at 6–7, ¶ 3. Team knew that faulty SRVs could lead to devastating consequences. *Id.* at 7, ¶ 4.[2]

Team inspected SRV 3-125 and determined that it was outside the manufacturer's specifications and could not meet VR standard. *Id.* 7, ¶ 5. Team knew that SRV 3-125 could not be repaired back into compliance and should not be returned to service. *Id.* at 7, ¶ 6. Team knew that SRV 3-125 should have been replaced rather than repaired, and attempting to repair it was improper. *Id.* at 7, ¶ 7. Yet Team attempted repairs that took SRV 3-125 further out of tolerance. *Id.* at 7, ¶ 8. Team did not remove and replace SRV 3-125 even though it knew the valve should not have been used. *Id.* at 7–8, ¶ 9.[3] Team did not complete a nonconformance report nor place a QC hold tag, as required by the Team VR Quality Control Manual. *Id.* at 8, ¶ 10. Team recorded SRV 3-125 as compliant. *Id.* at 8, ¶ 11.[4]

---

Team's work for Westar. To give additional background, the Court cobbles together what appear to be undisputed facts from the Pretrial Order and the parties' briefing.

[2] Team purports to controvert this assertion by stating that the employee testified that he "didn't understand what [the SRV] was going to do," but this does not controvert his testimony that he knew a faulty SRV could lead to devastating consequences. *See* Doc. 80 at 5, ¶ 4. Most also asserts that Team knew that the devastating consequences include chatter that loosens bolts connecting the valve to discharge piping, but this statement is not supported by the cited testimony. Doc. 72 at 7, ¶ 4.

[3] Most also asserts that Team did not remove and replace any of SRV 3-125's component parts, but Team properly disputed this fact. Doc. 72 at ¶ 9; Doc. 80 at 6, ¶ 9.

[4] Most also asserts that Team did not tell anyone at Westar that the valve was not VR compliant, but this fact is disputed. Doc. 72 at 7–8, ¶ 12; Doc. 80 at 6–7, ¶ 12.

An SRV lifting and releasing steam through the discharge piping out of the roof is typical and normal. Doc. 50 at 5, ¶ 2. But on June 3, 2018, SRV 3-125's discharge piping separated from the valve causing an uncontrolled release of steam into a room in the JEC. Doc. 50 at 3; Doc. 72 at 2. Jesse Henson was injured in the steam release incident and died the next day as a result of his injuries. Doc. 44 at 2. The parties vigorously dispute whether Team's failure to properly service SRV 3-125 caused the steam release incident and whether the steam release incident was a foreseeable consequence of Team's actions. Doc. 50 at 5–6, ¶¶ 3–6; Doc. 72 at 4–6, 8–9.[5]

## II. LEGAL STANDARD

### A. Summary Judgment

Summary judgment is appropriate when the moving party demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" when it is necessary to resolve a claim. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998). Disputes over material facts are "genuine" if the competing evidence would permit a reasonable jury to decide the issue in either party's favor. *Id.* To determine whether a genuine dispute exists, the court views the evidence, and draws all reasonable inferences, in the light most favorable to the nonmoving party. *Id.* Once the moving party meets its burden, the burden shifts to the nonmoving party to "set forth specific facts" from which a reasonable jury could find for the nonmovant. *Id.* at 671.

---

[5] Team also asserted that it did not act willfully, fraudulently, or with malice, and that Team did not act with reckless disregard or indifference to the consequences, but these are disputed legal conclusions that the Court gives no weight. *Compare* Doc. 50 ¶¶ 1, 5 *with Orchestrate HR, Inc. v. Blue Cross & Blue Shield of Kansas, Inc.*, 2024 WL 277893, at *2 n.1 (D. Kan. Jan. 25, 2024), *motion to reopen granted*, 2024 WL 2051828 (D. Kan. May 8, 2024).

### B. Motions to Exclude Expert Testimony

Federal Rule of Evidence 702 governs expert testimony and imposes a gatekeeping role on the district courts to ensure that expert testimony is both relevant and reliable. Fed. R. Evid. 702; *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993); *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999). This role requires the district courts to "determine whether the expert is qualified 'by knowledge, skill, experience, training, or education' to render an opinion," and, if the expert is qualified, to "determine whether the expert's opinion is reliable by assessing the underlying reasoning and methodology, as set forth in *Daubert*." *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009) (quoting Fed. R. Evid. 702).

"The proponent of expert testimony bears the burden of showing that its proffered expert's testimony is admissible." *Id.* And so, "[t]he party offering the expert 'must show that the method employed by the expert is scientifically sound and that the opinion is based on facts which satisfy Rule 702's reliability requirements.'" *Id.* (quoting *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1222 (10th Cir. 2003)) (internal alteration omitted).

## III. ANALYSIS

### A. The Court denies Team's summary judgment motion as to Most's claim for punitive damages based on wanton conduct, but grants the motion as to Most's claim for punitive damages based on fraud.

Team moves for summary judgment on Most's claim for punitive damages, arguing that Most cannot establish by clear and convincing evidence that Team acted toward Henson with willful or wanton conduct, fraud, or malice. In Kansas, a plaintiff may be awarded punitive damages where she proves "by clear and convincing evidence in the initial phase of the trial, that

the defendant acted toward the plaintiff with willful conduct, wanton conduct, fraud or malice." K.S.A. 60-3702(c); *see also Adamson v. Bicknell*, 295 Kan. 879, 879 Syl. ¶ 3 (2012).[6]

In response, Most argues that she has presented evidence that Team acted with wantonness and fraud and affirmatively states that she is not pursuing liability under theories of willful or malicious conduct. Accordingly, the Court finds any claim for punitive damages arising out of willful or malicious conduct abandoned. *Cl.G. v. Siegfried*, 38 F.4th 1270, 1282 (10th Cir. 2022) (affirming district court's dismissal of an abandoned claim). The Court now turns to Most's claim for punitive damages based on wantonness and fraud.

**1. Most has set forth evidence from which a reasonable jury could conclude Team acted wantonly.**

To establish wanton conduct, a plaintiff must show that the defendant's "act was 'performed with a realization of the imminence of danger,'" and "that the act was performed with 'reckless disregard or complete indifference to the probable consequences of the act.'" *Adamson*, 295 Kan. at 890 (quoting *Reeves v. Carlson*, 266 Kan. 310, 310 Syl. ¶¶ 3–4 (1998)). "Wanton acts are those showing that the defendant realized the imminence of injury to others and refrained from taking steps to prevent injury because of indifference to the ultimate outcome, not that the defendant lacked simple due care." *Id.*

Team was hired by Westar to perform service and repair work on pressure SRVs at a Westar power plant in April 2018. Team inspected SRV 3-125 and determined that it was outside the manufacturer's specifications and could not meet the VR standard. Team knew that SRV 3-

---

[6] K.S.A. 60-3702 also provides that when a plaintiff seeks punitive damages against an employer, the plaintiff must prove "the questioned conduct was authorized or ratified by a person expressly empowered to do so on behalf of the principal or employer." K.S.A. 60-3702(d)(1). But neither party discusses whether this standard must be, or has been, met in this case. Because Team bears the burden on its motion, the Court will not wade into this issue unprompted. *See Adler*, 144 F.3d at 670–71.

125 could not be repaired back into compliance and should not be returned to service. Yet Team attempted repairs that took SRV 3-125 further out of tolerance and recorded SRV 3-125 as compliant. Team did not complete a nonconformance report nor place a QC hold tag, as required by the Team VR Quality Control Manual. And Team took these actions knowing that the SRV was an extremely important safety device, knowing that people's lives depended on the SRV working correctly, and knowing that faulty SRVs could lead to devastating consequences.

These facts, especially viewed in the light most favorable to Most, are sufficient to survive summary judgment. A reasonable jury could conclude by clear and convincing evidence that Team was aware of an imminent danger in recording the non-compliant SRV 3-125 as compliant and that Team recklessly disregarded the risk or was indifferent to it. *Cf. Rios v. Bigler*, 847 F. Supp. 1538, 1548 (D. Kan. 1994) (finding that summary judgment on a plaintiff's claim of punitive damages was appropriate where the plaintiff failed to show that her "doctors were aware that the failure to take actions that they did not take posed a serious threat" to her health).

Team argues that it did not have "a realization of the imminence of the unknown and atypical danger of the discharge flange separating," but, to establish foreseeability, Most need only show that Team had "a common-sense perception of the risks involved . . . that a reasonably prudent person would take it into account." *Cupples v. State*, 18 Kan. App. 2d 864, 879 (1993). Although Team may not have anticipated the exact manner in which the SRV would fail or the consequences thereof, a reasonable jury could conclude that Team knew and was recklessly indifferent to the risk that certifying an extremely important safety device as compliant, when it was not, would lead to bodily harm. *See Reeves*, 266 Kan. at 314 (stating that the defendant defined what it means to commit a wanton act too narrowly where the defendant argued he had no reason

to anticipate a collision with a house, much less the plaintiff's house, while driving under the influence).

Likewise, there is a genuine dispute as to whether Team told anyone at Westar that the valve was not VR compliant. Although the jury may ultimately conclude that Team told Westar that SRV 3-125 was not compliant or that Team did not realize the imminence of the danger, or was not recklessly indifferent to it, Most has put forth sufficient evidence to survive summary judgment on her claim for punitive damages based on wanton conduct. *See Post v. Hanchett*, 2024 WL 776102, at *3 (D. Kan. Feb. 26, 2024).

**2. Most has not met her burden on her claim for punitive damages based on fraud.**

To establish a claim of fraud by silence, a plaintiff must show:

> (1) The defendant had knowledge of material facts that the plaintiff did not have and could not have discovered by the exercise of reasonable diligence; (2) the defendant was under an obligation to communicate the material facts to the plaintiff; (3) the defendant intentionally failed to communicate to the plaintiff the material facts; (4) the plaintiff justifiably relied upon the defendant to communicate the material facts to the plaintiff; and (5) the plaintiff sustained damages as a result of the defendant's failure to communicate the material facts to the plaintiff.

*Stechschulte v. Jennings*, 297 Kan. 2, 21 (2013). Although Most asserts fraud by silence as one of the bases for her claim for punitive damages, Most did not bring a claim for fraud by silence against Team in this case. Doc. 44 at 19. And "[c]laims for punitive damages do not stand in isolation; they are instead tied to liability determinations on claims presented to the trier of fact." *A.H. ex rel. Hohe v. Knowledge Learning Corp.*, 2011 WL 2731757, at *3 (D. Kan. July 13, 2011) (citing *Mason v. Texaco, Inc.,* 948 F.2d 1546, 1554 (10th Cir. 1991)). Because "a punitive damage award is incident to and dependent upon the recovery of actual damages," Most cannot recover punitive damages for fraud by silence without an underlying fraud claim. *Id.* (quoting *Smith v. Printup*, 254 Kan. 315, 322 (1993)).

Even if Most could proceed on a claim for punitive damages that is distinct from her underlying claims, Most has failed to present evidence that Team was under an obligation to communicate the material facts to Henson. Generally, the legal or equitable duty to communicate "must arise from a relationship existing between the parties when the suppression or concealment is alleged to have occurred." *Welch v. Centex Home Equity Co., L.L.C.*, 262 F. Supp. 2d 1263, 1268 (D. Kan. 2003) (quoting *DuShane v. Union Nat'l Bank*, 223 Kan. 755, 760 (1978)). This can include "two contracting parties when there is a disparity of bargaining powers or of expertise" or when "the parties to a bargain are in a fiduciary relationship to one another." *Id.* (quoting *DuShane*, 223 Kan. at 760); *see also Leathers v. Leathers*, 2012 WL 1935021, at *5 (D. Kan. May 29, 2012), *aff'd*, 856 F.3d 729 (10th Cir. 2017).

Most's response to Team's motion for summary judgment focuses solely on Team's duty to Westar without any analysis of how Team's duty to disclose to Westar could extend to Henson. Most does not produce any evidence that Henson communicated with Team or relied on Team to disclose material facts to him. And, although the Kansas Court of Appeals has noted that plaintiffs may establish fraud in some cases involving third party or indirect reliance, plaintiffs must "establish that (1) they received the information from someone who received it from defendant; (2) defendant intended the information to be conveyed to them and (3) they justifiably relied on the information." *Hernandez v. Pistotnik*, 58 Kan. App. 2d 501, 514 (2020) (quoting Restatement (Second) of Torts § 533 (1977) with approval). Here, Most has made no such factual showing.

Although Team owed a generalized duty of reasonable care, Most has not established a particularized duty to notify Henson of the compliance status of the SRV or that Henson relied on Team's certification of the SRV. *See N. Nat. Gas Co. v. Am. Warrior, Inc.*, 2026 WL 828722, at *7 (D. Kan. Mar. 26, 2026). As such, no reasonable jury could conclude that the elements of fraud

by silence are met on the facts here. *See Welch*, 262 F. Supp. 2d at 1268. Because Most has failed to establish the underlying elements of a fraud claim, summary judgment on Most's claim for punitive damages on the basis of fraud is warranted.

**B. The Court allows Van Iderstine and Carden's testimony.**

Team next moves to exclude the expert opinions of Eric Van Iderstine and William Carden. Doc. 45. Van Iderstine and Carden were retained by Most and are described as "failure analysis experts." Doc. 67 at 1. A major dispute in this case is what caused SRV 3-125 to fail. Van Iderstine and Carden opine that Team improperly reassembled SRV 3-125 and that this improper machining "altered the geometry of the valve's seating area, causing it to chatter by repeatedly opening and closing, which led to progressive damage to the valve components and fasteners holding the discharge vent piping flange in place." Doc. 46-4 at 38.

Team does not challenge Van Iderstine's and Carden's qualifications or the reliability of their methods, but argues that their opinions do not fit the facts of the case. Docs. 46. In short, Team asserts that witness testimony and SRV 3-125's condition after the incident contradict Van Iderstine and Carden's theory and renders their opinions unreliable. Having reviewed the cited testimony, the Court concludes that Van Iderstine and Carden's opinions are admissible and that Team's concerns are better suited for cross-examination.

**1. Van Iderstine and Carden's opinions are not directly contradicted by witness testimony.**

Team first argues that Van Iderstine and Carden opined that SRV 3-125 was chattering anywhere from ten to twenty minutes prior to the incident, that SRV 3-125 chattered thousands of times in that window, and that SRV 3-125 self-destructed. Team asserts that these opinions are directly contradicted by Westar employee testimony, however. Doc. 46 at 7. To support this argument, Team highlights the testimony of three Westar employees: (1) Westar employee

Thomas Duscheshneau testified that he walked through the floor on which SRV 3-125 was located fifteen to twenty minutes before the incident, but did not see a steam release; (2) Westar employee Michael Thompson testified that he only heard one steam release on the morning of the incident; and (3) Westar employee Keaton Riddle noticed a steam release from Unit 3 as he was in his vehicle leaving the JEC property, but "could not hear metal on metal." *Id.* at 7–10.

First, Duscheshneau's testimony does not warrant exclusion of Van Iderstine and Carden's opinions. As noted in Team's opening brief, Van Iderstine and Carden opined that chattering occurred anywhere from ten to twenty minutes prior to the incident. Even taking Duscheshneau's time estimate as accurate to the minute, Duscheshneau's testimony would exclude only five minutes from the ten- to twenty-minute range given by Van Iderstine and Carden. Because it is plausible that SRV 3-125 began chattering ten to fifteen minutes prior to the incident and shortly after Duscheshneau exited the area, Van Iderstine and Carden's opinions are not directly contradicted by the record.

Likewise, Thompson's testimony that he only heard one steam release while several hundred feet away in a different unit of the plant does not definitively establish that that multiple steam releases could not have occurred. The disputed nature of this issue is evidenced by Riddle's testimony that he believed he heard quick popping sounds over the course of three to four minutes, which he believed to be steam "being released and then not being released, released, not released, over and over again." Doc. 67 at 11.

Similarly, Team's assertion that Riddle could not hear "metal on metal sounds" from hundreds of feet away in the parking lot of the JEC does not foreclose the possibility of chatter. And Riddle's testimony that steam was "being released and then not being released, released, not

released, over and over again" instead seems to support Van Iderstine and Carden's theory of chatter.

Although an expert opinion cannot be based on facts that are contradicted by undisputed evidence, "[e]xperts often reach different conclusions based on competing versions of the facts." *Doe v. Lewis Roca Rothgerber Christie LLP*, 2025 WL 2815641, at *4 (D.N.M. Sept. 30, 2025) (citing Fed. R. Evid. 702 advisory committee's note to 2023 amendment). By deciding the disputed facts, the jury decides which side's experts to credit. *Id.* Team's disagreement with Van Iderstine and Carden's assessment of the disputed facts goes to the weight of their testimony, not the admissibility. *See Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1238 (10th Cir. 2005) ("[E]xpert testimony 'fits' because it involves a reliable method that would aid the jury in resolving a factual dispute; whether the jury finds that the testimony 'fits' their best assessment of the truth of the matter is an altogether different issue."); *see also* Fed. R. Evid. 702 advisory committee's note to 2023 amendment ("The emphasis in the amendment on 'sufficient facts or data' is not intended to authorize a trial court to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other."). Team can address these disputed facts on cross-examination. *Scriven v. Vitalcore Health Strategies, LLC*, 2026 WL 1413158, at *5 (D. Kan. May 20, 2026).

**2. Team's characterization of Van Iderstine's testimony does not warrant exclusion of Van Iderstine and Carden's opinions.**

Next, Team argues Van Iderstine and Carden's opinions are not supported by the physical evidence in the case. Team asserts that Van Iderstine opined that SRV 3-125 self-destructed, but that the physical evidence does not support self-destruction of the valve. Doc. 46 at 11. And so, Team argues that Van Iderstine and Carden's opinions should be excluded. But as noted by Most in her response to Team's motion, Van Iderstine and Carden did not opine in their report that SRV

3-125 self-destructed. Rather, Team latches onto the following exchange from Van Iderstine's deposition:

> **Team's Counsel:** And you have a hypothesis here that this valve chattered so badly that it self-destructed, it jackhammered, to borrow plaintiff's counsel's phrase, and it blew the elbow off; is that true?
>
> **Van Iderstine:** The sequence, yes.

Doc. 67 at 13.

Van Iderstine's three-word response serves as the entire basis for Team's argument that Van Iderstine and Carden's opinions are unsupported by the physical evidence in the case. But the question posed to Van Iderstine is not a model of clarity and Van Iderstine stated only that he agreed with the sequence of events proposed by Team's counsel. Although Team states that Van Iderstine was "in agreement" that "the sequence this valve experienced was chatter, self-destruction, and jackhammer," it is equally plausible that Van Iderstine, by qualifying his response, merely agreed that the valve chattered so badly that it blew the elbow off.

What Team's counsel or Van Iderstine understood "self-destructed" to mean is also entirely unclear. And Team points to no further discussion of self-destruction in the transcript or Van Iderstine and Carden's report. Because the opinion that the valve "self-destructed" appears to be entirely of Team's own making, the Court will not address this strawman further. *United States v. Jones*, 2026 WL 1030542, at *11 (D. Kan. Apr. 16, 2026).[7]

---

[7] Team also argues on reply that Van Iderstine and Carden's chattering theory is unsupported by the evidence because a Team corporate representative testified that a valve's internal components would "weld together" during a chattering event and the photographic evidence does not demonstrate welding. Doc. 79 at 3. The Court generally does not address arguments raised for the first time on reply. *Korgan v. Est. of Hansen*, 2022 WL 4465074, at *5 (D. Kan. Sept. 26, 2022). Regardless, Team's corporate representative's opinion of what generally happens in a chattering event does not render Van Iderstine and Carden's opinions based on insufficient facts and data or unreliable methods; it merely highlights a factual dispute between the parties. *See Scriven*, 2026 WL 1413158, at *5.

The Court rejects Team's argument that Van Iderstine and Carden's opinions are not based on the facts of the case and are thus unreliable. Team's motion to exclude Van Iderstine and Carden is denied.

### C. Most must designate either Dr. Sanders or Dr. Hall as her chosen medical expert by January 20, 2027.

Team next moves to exclude the expert testimony of Dr. Geremy Sanders and Dr. Jesse Booth Hall. Doc. 53. Team argues that Dr. Sanders and Dr. Hall will provide duplicative testimony and that Dr. Sanders also provides opinions that are not relevant, are not based on sufficient facts or data, and do not reflect a reliable application of the principles and methods to the facts of the case.

#### 1. Most does not dispute that Dr. Sanders' and Dr. Hall's testimony would be cumulative.

First, Most concedes that she cannot call both Dr. Sanders and Dr. Hall at trial. She states that she will only call one of the medical experts to testify and proposes that her decision be made 30 days before trial to give Team time to prepare for trial and cross-examination. On reply, Team does not object to this proposal. The Court grants Team's motion to the extent that it requests that Most be limited to one medical expert at trial. The Court will allow Most to designate either Dr. Sanders or Dr. Hall as her chosen medical expert by January 20, 2027.

#### 2. Dr. Sanders' opinions regarding the long-term treatment and suffering of burn patients are excluded, but Dr. Sanders may testify about his opinions regarding burn patients' suffering in the immediate aftermath of a burn injury.

Next, Team argues that Dr. Sanders' opinions regarding the long-term suffering of burn patients should also be excluded. Dr. Sanders opined that patients who survive their burns continue to suffer for many years with long-term pain and psychological trauma. Team argues that this

testimony is not relevant, is unduly prejudicial, is not based on sufficient facts or data, and is not the product of reliable application of the principles and methods to the facts of the case.

Most does not contest Team's motion to the extent it challenges the relevance of burn patients' experiences over the course of many years, but opposes it to the extent it encompasses Dr. Sanders' explanation that patients "consistently recount a history of being in the burn unit and miserable with pain . . . including when the patient is treated with the types of medications that Jesse Henton was treated with." Doc. 66 at 3. On reply, Team asserts that this testimony is still irrelevant because Dr. Sanders testified that the survival rate of patients with injuries as severe as Henson's is essentially zero. And so, Team argues that because there are no surviving patients who suffered burns as severe as Henson's, the surviving patients' experiences "over a course of days, weeks, months, or years" are irrelevant.

Although the Court agrees that patients' experiences over weeks, months, and years are not relevant to Henson's suffering, Team does not articulate why other patients' survival makes their experiences of pain in the immediate aftermath of a burn injury irrelevant to Henson's experience. Nor does Team explain its statement that Dr. Sanders' testimony is not based on sufficient facts or data and is not the product of reliable application of the principles and methods to the facts of the case. Team's arguments are therefore better suited to cross-examination. *See Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."); *Gomez v. Martin Marietta Corp.*, 50 F.3d 1511, 1519 (10th Cir. 1995) (holding that "the weaknesses in the data upon which [the] expert relied go to the weight the jury should have given her opinions").

If Most selects Dr. Sanders as her designated medical expert at trial, the Court will allow Dr. Sanders' opinion testimony regarding the suffering Henson likely experienced in the hours before he died, but excludes any testimony about what burn patients experience in the weeks, months, and years after surviving a burn injury.

**D. Sid Cammeresi may not testify as an expert in this matter.**

Team next moves to exclude the expert testimony of Sid Cammeresi. Doc. 55. Cammeresi is a former Team employee who left Team on March 1, 2018—about one month before Team performed the service and repair work in issue in this case. Doc. 75-1 at 12. Cammeresi was initially retained by Team in the Texas lawsuit to opine on how certain engineering and inspection standards applied to Team's conduct in servicing Westar's safety relief valves. Doc. 56 at 1.[8] Cammeresi was deposed by Most in the Texas lawsuit, but Team elected not to retain Cammeresi in this lawsuit. *Id.*

Most then disclosed Cammeresi as a non-retained expert under Rule 26(a)(2)(C) in this lawsuit, stating in her disclosures that Cammeresi would be "expected to offer opinion testimony consistent with his prior deposition testimony in this case." Doc. 56-3 at 4. Team now argues that (1) Cammeresi is not a true non-retained expert because he is not a fact witness to any of the events at issue in this case, (2) Cammeresi is not qualified to render opinions consistent with all topics covered in his prior deposition testimony, and (3) Team's prior communications with Cammeresi are inadmissible.

---

[8] This case was initially filed and litigated in Texas state court before dismissal on forum non conveniens grounds. *See* Doc. 1 at ¶¶ 6–12; Doc. 14 at ¶¶ 6–12.

### 1. Cammeresi was required to provide an expert report under Rule 26(a)(2)(B).

Written reports are required under Rule 26(a)(2)(B) for experts who are "retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony." In determining whether an expert is "retained or specially employed," courts look to whether the "testimony consists of information that was obtained by the witness by virtue of his or her role as an actor or viewer of the transactions or occurrences giving rise to the litigation" or whether the expert was retained to "'develop specific opinion testimony' that goes beyond facts, information, or evidence the witness observed or knew from his pre-litigation relationship with the disclosing party." *Methods Rsch., Inc. v. Ottawa Bancshares, Inc.*, 2025 WL 823243, at *7–8 (D. Kan. Mar. 13, 2025), *review denied sub nom. Methods Rsch., Inc. v. Bancshares*, 2025 WL 1368843 (D. Kan. May 12, 2025) (citations omitted).

"The determinative issue is the scope of the proposed testimony." *Chambers v. Fike*, 2014 WL 3565481, at *4 (D. Kan. July 18, 2014) (quoting *Jones v. Greyhound Lines, Inc.*, 2009 WL 2195760, at * 2 (D. Kan. July 22, 2009)). As the First Circuit has observed:

> In order to give the phrase "retained or specially employed" any real meaning, a court must acknowledge the difference between a percipient witness who happens to be an expert and an expert who without prior knowledge of the facts giving rise to litigation is recruited to provide expert opinion testimony. It is this difference, we think, that best informs the language of the rule.

*Downey v. Bob's Disc. Furniture Holdings, Inc.*, 633 F.3d 1, 6 (1st Cir. 2011). And so, the real test is this: was the witness hired solely to be an expert? Or is he a fact witness who also happens to be an expert? Given this dichotomy, Cammeresi clearly falls in the former category.

"A percipient witness is an individual who, though an expert, derives an opinion by virtue of the witness's role as either an actor or viewer of the transaction or occurrence giving rise to the litigation." *Robertson v. Red Rock Canyon Sch., LLC*, 2008 WL 2989245, at *2 (D. Utah July 31,

2008) (citation cleaned up). Cammeresi has no first-hand knowledge of the events involved in this litigation; any opinion he might express about the SRV's condition and whether Team acted outside the standard of care in April 2018 is drawn entirely from interpreting information provided to him by the parties in the course of the two lawsuits. This testimony would require Cammeresi to prepare an expert report in accordance with Rule 26(a)(2)(B)—which he has not. Most has violated Rule 26(a)(2)(B).

**2. Team is prejudiced by Most's failure to provide an expert report and exclusion is the most appropriate remedy.**

Where, as here, a party has violated its discovery obligations, Rule 37(c)(1) provides that the party may not use that witness or testimony at trial "unless the failure was substantially justified or is harmless." In determining whether a failure was substantially justified or harmless, the Court considers:

> (1) the prejudice or surprise to the party against whom the testimony is offered; (2) the ability of the party to cure the prejudice; (3) the extent to which introducing such testimony would disrupt the trial; and (4) the moving party's bad faith or willfulness.

*Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 953 (10th Cir. 2002).

Most argues that there is no prejudice or surprise to Team in allowing Cammeresi's testimony because Team has known of Cammeresi's deposition testimony for six years and knows what Cammeresi's opinions are. But as is evident from the parties' briefing and Cammeresi's deposition transcript, Cammeresi provided opinion testimony on so many individual topics in his deposition that it is difficult for the Court to assess which opinions Most intends to elicit at trial—let alone whether Cammeresi is qualified to offer them. And Team knowing that its prior, retained expert testified to certain opinions in 2020 differs from anticipating that the same expert will be called to testify at trial as a fact witness. Because Most has deprived Team of the opportunity to

effectively prepare for cross examination of Cammeresi, Team is prejudiced by Most's inadequate disclosure.

Next, Most does not address her ability to cure the prejudice. Instead, Most reasserts her argument that there is no prejudice because Team was already aware of the testimony that Cammeresi would give at trial. Likewise, Most asserts that allowing Cammeresi to testify *without the benefit of additional discovery time* would not disrupt trial. But again, Team is prejudiced and a cure is necessary. Although Team does not suggest it, Most could cure the prejudice by providing an expert report. But allowing time for Cammeresi to prepare an expert report, for Team to depose him, and for Team to prepare a revised *Daubert* motion would certainly disrupt the currently scheduled trial. The second and third factors favor exclusion.

Finally, the record does not demonstrate bad faith, but Most offers no justification for her failure to provide an expert report. Again, she emphasizes only that there can be no prejudice to Team as Team has known of Cammeresi's opinions since his February 2020 deposition in the Texas lawsuit. Although the Court does not find bad faith, Most has failed to suggest a cure for her inadequate disclosure, has failed to address the disruption to the trial schedule, and has failed to show that the inadequate disclosure was substantially justified. The Court finds that Most's failure to produce a Rule 26(a)(2)(B) report was neither substantially justified nor harmless and excludes Cammeresi as a witness at trial.

**E. The Court allows the testimony of Leo Haynos, but excludes the expert testimony of John Gorrell, Tim Stringer, and Jeff McClanahan.**

Most moves to exclude the expert testimony of Leo Haynos, John Gorrell, Tim Stringer, and Jeff McClanahan. Doc. 57. Haynos led an investigation by the Kansas Corporation Commission ("KCC") into the steam release incident that is the subject of this lawsuit, which culminated in a report and recommendation to the KCC. Doc. 57 at 2; *see also* Doc. 57-2. Gorrell,

Stringer, and McClanahan were listed as co-authors on the KCC Report. Doc. 57 at 2; *see also* Doc. 57-2. Most argues that (1) all four lack the qualifications to testify to the KCC Report's contents; (2) their testimony is not reliable or does not fit the issues the jury must decide in the case; (3) the conclusions in the KCC Report are contradicted by the record; and (4) their testimony is needlessly cumulative.

**1. The Court declines to exclude Leo Haynos.**

Leo Haynos is a licensed Kansas Professional Engineer with a bachelor's degree in petroleum engineering. Doc. 61 at 2. Haynos began his professional career in 1981, working in the oilfield industry through 1995 when he began working in emissions for the Kansas Department of Health and Environment. *Id.* at 2–3. In 1998, Haynos joined the KCC, initially working in pipeline safety. *Id.* at 3. He has worked with pressurized piping systems, conducted multiple investigations throughout the years in his role with the KCC, and authored numerous reports and recommendations in his KCC career. *Id.* Many of these investigations dealt with safety-related conditions, including addressing causation and how incidents occurred. *Id.*

**a. Haynos is qualified.**

Most first asserts that Haynos is not qualified. Most argues that the KCC's investigation into the JEC was outside of the KCC's ordinary experience and expertise, and that Haynos' background in petroleum engineering renders him unqualified to render opinions regarding steam-generating power plants or safety relief valve systems of the scale at the JEC. Doc. 57 at 5–6. Proposed expert testimony must "fall within the reasonable confines of [the witness's] expertise." *Taber v. Allied Waste Sys., Inc.*, 642 F. App'x 801, 807 (10th Cir. 2016) (quoting *Conroy v. Vilsack*, 707 F.3d 1163, 1169 (10th Cir. 2013)) (alteration in original). Haynos is a licensed, professional engineer with decades of experience, including years at the KCC working in pipeline

safety. Doc. 61 at 2–3. Haynos has conducted multiple investigations throughout the years in his role with the KCC, almost all of which dealt with safety-related conditions. *Id.*

Most argues that Haynos lacks necessary "specialized knowledge of steam systems, power-plant operation realities, and the codes and procedures that govern SRV inspection and repair work," but Haynos testified that engineering practices in piping and pressure piping are synonymous across the industries, and Most has failed to provide argument as to why Haynos' assertion is inaccurate. Doc. 57 at 6; Doc. 61 at 3 (citing Haynos deposition transcript at 94:5-21). Instead, Most argues only that that safety relief valves in the natural-gas context are much smaller than in this context and that Haynos had never worked with valves that were welded into the system. Doc. 57 at 5–6.[9] Most asserts that these distinctions are critical, but Most does not explain why those distinctions render Haynos unqualified to render the opinions contained in the KCC Report. *Id.* at 6. The Court is therefore not persuaded that Haynos should be excluded on this basis.

The Court is also unpersuaded by Most's citation to *Taber v. Allied Waste Systems*. The Tenth Circuit concluded in *Taber* that a district court did not abuse its discretion in determining that an expert who lacked specific knowledge and expertise in the area of ladder design and ladder-accident investigation was not qualified to testify on fixed-ladder accidents. 642 F. App'x at 808. Most asserts that because Haynos and the KCC had never conducted an investigation into a coal-fired power plant before this incident, Haynos, like the proposed expert in *Taber*, lacks the specialized experience necessary to render an opinion in this case.

But the question of an expert's qualifications hinges on the opinion testimony he offers. *See id.* at 807. And Haynos does not provide opinions regarding the "technical conditions that

---

[9] Most cites to a page of Haynos' deposition that was not provided to the Court when arguing that Haynos had never worked with valves that were welded into the system. Team does not assert in its response that this is an incorrect characterization of that testimony, so the Court accepts it for purposes of this motion.

cause superheated steam releases at this scale" as Most suggests, but focuses on Westar's procedures at the time of the incident and the human errors that allowed the incident to occur. *See generally* Doc. 57-2. The Court concludes that Haynos' specialized experience and knowledge in his role as a professional engineer and at the KCC sufficiently qualify him to render the opinions contained in the KCC Report.

**b. Haynos' testimony does not violate Rule 703.**

Most also asserts that Haynos should be excluded under Federal Rule of Evidence 703 because the conclusions in the KCC Report are not his own, but those of James Nelson, an Occupational Safety and Health Administration employee. Doc. 57 at 6. Rule 703 provides:

> An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted. But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect.

Fed. R. Evid. 703. An expert "may not simply parrot or recite the opinions and knowledge of other expert and fact witnesses," but "may rely on the opinions of another expert if they inform or contribute to his own independent opinions." *Ash Grove Cement Co. v. Emps. Ins. of Wausau*, 246 F.R.D. 656, 661 (D. Kan. 2007).

Haynos testified that Nelson was brought in to "look at our work and critique it for us and ask us questions." Doc 61-1 at 10–11. He also testified that Nelson would "critique what we were writing" and doing and act as a "background check." *Id.* at 24–25. Although Haynos testified that these critiques helped the KCC reach its conclusions, Haynos' testimony does not indicate that Haynos' conclusions were not his own or that Haynos parroted Nelson's opinions or methodologies. *Id.* at 10–11. Instead, it is clear that Haynos believes he is qualified to offer the

opinions and reach the conclusions contained in the report. *Id.* at 18. The Court permits Haynos to offer his opinion to the extent it is based on his own review of the steam release incident.

**c. Haynos' testimony sufficiently fits the issues the jury must decide in the case.**

Most next argues that Haynos' proposed testimony also fails Rule 702 because it does not fit the facts and issues that will be tried to the jury. Most asserts that because the KCC Report was focused on Westar rather than "all entities whose acts or omissions may have contributed to the steam release," it cannot be viewed "as a reliable assessment of the liabilities in this litigation." But the KCC Report does not present itself as an assessment of the liabilities in this litigation. Instead, Haynos testified that the KCC was "looking at Westar to understand how their practices were put into place that could have caused this failure to occur." Doc. 57-3 at 22–23.

And Team, as Most recognizes, will likely to seek to diffuse responsibility to Westar at trial. *See* Doc. 19; Doc. 44 at ¶ 4(b)(i). The KCC Report is therefore directly relevant to the issues that will be tried to the jury. Because the KCC Report will assist the trier of fact in deciding whether Westar should share in any of the responsibility for the steam release, the Court disagrees with Most's assertion that the KCC Report is not a "fit" for this case. *Bitler*, 400 F.3d at 1234 ("A trial court must look at the logical relationship between the evidence proffered and the material issue that evidence is supposed to support to determine if it advances the purpose of aiding the trier of fact.").

**d. Haynos' testimony is not contradicted by undisputed facts.**

Most also argues that Haynos' testimony is directly contradicted by the record because the KCC Report wrongly (1) concluded that there was no clear directive for Team to inspect the discharge piping; and (2) concluded "that the condition of the flange connectors for all three units would have been substantially the same as in 2017." Doc. 57 at 13–14. But Most's cited evidence

does not support her argument that the KCC Report directly contradicts the record. Instead, the exhibits produced by both parties indicate that the parties dispute whether Westar expected Team to inspect the discharge piping and whether Team did in fact disconnect and inspect the flange connectors as part of the SRV 3-125 repair work.

Most recognizes as much in her reply brief, where she shifts her argument to state that the KCC Report treats disputed factual issues as established premises. But as addressed above, "[e]xperts often reach different conclusions based on competing versions of the facts." *Lewis Roca Rothgerber*, 2025 WL 2815641, at *4 (citing Fed. R. Evid. 702 advisory committee's note to 2023 amendment). Most's disagreement with the KCC Report's conclusions go to the weight of Haynos' testimony, not its admissibility. *See Bitler*, 400 F.3d at 1238; *see also* Fed. R. Evid. 702 advisory committee's note to 2023 amendment. Most can address these disputed facts on cross-examination. *Scriven*, 2026 WL 1413158, at *5.

**e. Rule 403 does not warrant exclusion of Haynos' testimony.**

Most asserts that Haynos' testimony should be excluded as it risks confusing the issues, misleading the jury, and is needlessly cumulative. Under Federal Rule of Evidence 403, the Court may exclude evidence if its probative value is substantially outweighed by the danger of "unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Most first asserts that the jury will be misled into believing that a neutral government agency "cleared" Team despite the KCC's jurisdictional limits, but it is evident from the KCC Report that it does not serve to "clear" Team. *See generally* Doc. 57-2. And Most may elicit the jurisdictional limits of the KCC's investigation at trial. Because Most can offset the risk that Haynos' opinion will mislead the jury through cross-examination or requesting a limiting instruction, the Court declines to exclude Haynos' testimony on this basis. *See In re*

*EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*, 2021 WL 2577490, at *30 (D. Kan. June 23, 2021).

Most also argues that Haynos' testimony is needlessly cumulative because it will address "the same core technical issues" presented by Team's retained experts. Doc. 57 at 14. But Most does not provide further detail other than stating that this includes "causation, inspection practices, and compliance with governing standards." *Id.* Without a more detailed argument, the Court declines to exclude Haynos' testimony on this basis. *Sullivan v. Unified Sch. Dist. No. 512*, 2025 WL 2732589, at *11 (D. Kan. Sept. 25, 2025). If it appears at trial that Haynos' testimony is needlessly cumulative, Most may object at that time.

**2. Because Team has not established that John Gorrell, Tim Stringer, and Jeff McClanahan are qualified to offer their proffered opinions, they are excluded from providing expert testimony.**

Finally, the Court excludes the testimony of John Gorrell, Tim Stringer, and Jeff McClanahan because Team has not met its burden to show that Gorrell, Stringer, and McClanahan are qualified to offer opinions in this case. "An expert must possess 'such skill, experience or knowledge in that particular field as to make it appear that his opinion would rest on substantial foundation and would tend to aid the trier of fact in his search for truth.'" *Rodgers v. Beechcraft Corp.*, 759 F. App'x 646, 658 (10th Cir. 2018) (quoting *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 928 (10th Cir. 2004)). And "[t]he proponent of expert testimony bears the burden of showing the expert is qualified." *Id.* (citing *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 970 n.4 (10th Cir. 2001)).

After Most asserted that Team had not met its burden to show that Gorrell, Stringer, and McClanahan were qualified to offer expert testimony in this case, Team argued that Plaintiff had chosen not to depose them and, thus, had no basis to attack their qualifications. Doc. 61 at 13. But Team's evidence of Gorrell's, Stringer's, or McClanahan's qualifications is extremely limited.

Team's expert disclosures provide only that Gorrell is a former Utilities Engineer for the KCC, that Stringer is a former Energy Engineer for the KCC, and that McClanahan is the former Director of Utilities for the KCC. Doc. 57-1 at 7–9. Team did not provide the Court with—or, at least, did not direct the Court to—curricula vitae for any of the three proposed experts or any other evidence of their knowledge, skill, experience, training, or education. *See* Doc. 61 at 13.

Yet Team's disclosure indicates that Gorrell, Stringer, and McClanahan will all provide testimony on:

1. Failure of JEC to implement the SRV repair procedures that were developed by JEC and had been available for a 2016 SRV repair process;

2. Failure of JEC to provide oversight of its contractors to ensure the service provided was complete and met JEC's expectations;

3. The failure of JEC and its insurance company, National Union, to observe missing tags that demonstrate a valve has had a certified inspection and repair (VR tags) and loose or missing connectors on the SRV discharge piping during the in-service inspection conducted in October of 2017, eight months before the accident; and

4. Failure of a certified valve repair contractor to provide a SRV repair for valve 3-125 that complied with boiler safety code requirements. The faulty repair led to repeated releases of steam below the pressure setpoint of the valve during startup and may have contributed to the failure of the discharge piping flange connecting bolts.

Doc. 57-1 at 8–10. Without some evidence or argument as to how Gorrell, Stringer, and McClanahan are qualified to render these opinions, the Court cannot conclude that their opinions "would rest on substantial foundation" and "tend to aid the trier of fact in his search for truth." *See Rodgers*, 759 F. App'x at 658. Team has failed to meet its burden under Rule 702. The Court excludes the testimony of Gorrell, Stringer, and McClanahan as expert witnesses in this case.

## IV. CONCLUSION

THE COURT THEREFORE ORDERS that Defendant's Motion for Partial Summary Judgment (Doc. 49) is GRANTED PART and DENIED IN PART. Summary judgment is granted in favor of Defendant on Plaintiff's claim for punitive damages based on willful conduct, malicious conduct, and fraud, but denies summary judgment on Plaintiff's claim for punitive damages based on wanton conduct.

THE COURT FURTHER ORDERS that Team's motion to exclude the expert testimony and opinions of Eric L. Van Iderstine and William Carden (Doc. 45) is DENIED.

THE COURT FURTHER ORDERS that Team's motion to exclude the expert testimony and opinions of Geremy Sanders and Jesse Booth Hall (Doc. 53) is GRANTED IN PART and DENIED IN PART. Most must designate either Sanders or Hall as her chosen medical expert by January 20, 2027.

THE COURT FURTHER ORDERS that Team's motion to exclude the expert testimony and opinions of Sid Cammeresi (Doc. 55) is GRANTED.

THE COURT FURTHER ORDERS that Most's motion to exclude the expert testimony of Leo Haynos, John Gorrell, Tim Stringer, and Jeff McClanahan (Doc. 57) is GRANTED IN PART and DENIED IN PART. The Court allows the testimony of Leo Haynos and excludes the testimony of John Gorrell, Tim Stringer, and Jeff McClanahan.

IT IS SO ORDERED.

Dated: November 23, 2026

s/ Jeffrey M. Kuhlman
JEFFREY M. KUHLMAN
UNITED STATES DISTRICT JUDGE